## FISH & HUNTER CO. et al. v. NEW ENGLAND HOME-STAKE CO. et al.

The allegations of an amendment to the complaint, setting up a claim on an implied contract, and made after the evidence was all in, plaintiff's evidence having been met by defendant, will be treated as denied, though the amendment was not answered.

. G., in whose name the title to mining claims stood, gave a company an option to buy the property, when patents were procured, in consideration of which it was to proceed with and bear the expenses of doing the things necessary for obtaining patents, which

under the federal law had to be procured by and in the name of G., the record owner of the claims. **Held,** that so far as concerns plaintiff, employed, with knowledge of the facts, by the attorney for the company, to do the surveying for it, the company or its attorney was not the agent of G., so as to make him liable to plaintiff for his work.

Where plaintiff, employed by a company to do work, never understood he was being employed by it as agent for defendant; there is no chance for application of the doctrine of ratification, so as to make defendant liable for plaintiff's compensation, on the ground of ratification of the company's act of employment.

A contract made between other owners of mining claims and G., owner of an interest therein, when they conveyed the claims to him, that he should proceed to obtain patents therefor, and, when obtained, should pay them a certain amount for their claims, or reconvey the property to them; and that he should not be bound for cost of patenting, unless the property should be purchased by M., and patent expenses paid by him; and that, if M. should fail to purchase, the patent expenses should be borne proportionately by those interested in the property, does not authorize recovery from G., by the surveyor, who, under contract with M., did the surveying necessary for patenting, under Civ. Code, § 1193, providing that a contract made expressly for the benefit of a third person may be enforced by him before the parties rescind it, as, even if there be any promise of G. in the contract for the benefit of the surveyor, a stranger to a promise may not sue on it, where there was no consideration therefor from him, and no duty or obligation to him, outside the contract, from the promisee.

G., in whose name the title to mining claims stood, and who had agreed with the former owners to obtain patents, gave an option to a company to buy the property when patented, in consideration for which it agreed to proceed with and bear the expenses of doing the things necessary for obtaining patents, which, under the federal law, had to be procured by and in the name of G.; he being the record owner. The company through its attorney hired P. to do for it the surveying necessary for obtaining patent. It failing to pay therefor, P. requested payment of G., who stated that he would not pay, and advised him to hold his field notes till paid by the company. **Held,** that within Civ. Code, § 1218, providing that a voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known or ought to have been known to the person accepting, no implied contract of G. to pay P. for his services arose on G. thereafter attaching to his application for patent the notes of P. which had been filed, and payment for which G. was told had been made.

(Opinion filed, March 29, 1911.)

Appeal from Circuit Court, Lawrence County.   Hon. WIL-LIAM G. RICE, Judge.

Action by the Fish & Hunter Company and another against the New England Homestake Company and others.   From a judgment for plaintiff Frank S. Peck, and from an order denying a new trial, defendant Chris Godfrey appeals.   Reversed.

*Martin & Mason,* for appellant.   *A. J. Plowman,* for respondent.

WHITING, J.   This action was brought by the plaintiff Frank S. Peck and other plaintiffs against the New England Homestake Company and Chris Godfrey, seeking to foreclose certain miners' liens against the mining property described in the complaint.   The cause was tried to the court without a jury. Findings and conclusions were filed in favor of the plaintiff Peck. A personal judgment was entered thereon against the defendant Chris Godfrey.   The miner's lien, claimed by Peck, was denied. And motion for a new  trial having been denied, the defendant Godfrey appealed to this court from such judgment and order denying a new trial.

The findings of fact herein are quite voluminous, and no useful purpose would be served by quoting the same in full.   Certain of such findings have been excepted to by the appellant; but the evidence would fully sustain the following facts, which are among those found by the trial court:   Several separate mining claims were involved in this action; said claims being originally taken or owned by different parties, and the defendant Godfrey being a part owner of some of the claims and sole owner of others.   All of these claims had been conveyed to Godfrey for the purpose of obtaining patents and selling such property.   In connection with these transfers, the several former owners had each entered into an agreement with Godfrey, on or about February 19, 1906, wherein it was agreed, among other things, that Godfrey should immediately proceed to obtain patents for said mining claims, and, when surveyor's receipts were issued therefor, that he should either pay the former owners $125 per acre for their claims or reconvey the property to the former owners; and

it was further agreed that Godfrey should not be bound for the cost of patenting said land, except in event that the property should be purchased and patent expenses paid by one McHugh; and further that, if McHugh should fail to purchase, the patent expenses "will have to be borne proportionately by those interested in the property." On February 13, 1906, Godfrey had executed, acknowledged, and deposited in escrow a deed to said McHugh to all of such lands, such deed to be delivered upon the terms of a certain option agreement, a memorandum of which was indorsed on envelope containing deed. Under the agreement, which was in writing and bore date February 9, 1906, McHugh was within 30 days to furnish the money necessary to institute patent proceedings upon such property and "prosecute the said proceedings diligently to final entry, bearing the entire expense thereof, as a consideration for the granting of this option," and upon issue of receiver's receipt he was to pay Godfrey $250 per acre for said lands. McHugh afterwards transferred his right, title, and interest in said lands, under such agreements with defendant Godfrey, to the defendant New England Homestake Company, of which company McHugh was manager. Under this agreement between Godfrey and McHugh and the assignment by McHugh to the New England Homestake Company, said company went into the possession of the mining property and made improvements upon the same, which said improvements were finally received and accepted by the defendant Godfrey upon failure of McHugh and said company to comply with the terms of the escrow. Plaintiff Peck was a surveyor, and, as such, he was employed by the defendant company, acting through one Russell, with the knowledge of Godfrey, to make the necessary surveys of these mining claims, which surveys were required to be filed in connection with the final proof upon such claims. The plaintiff Peck proceeded to and did complete such surveys, knowing at the time he was so employed to do such work that the defendant company was not the legal owner of said mining claim but simply had an equitable interest therein. The defendant company paid part of plaintiff's bill for such services, but $400 thereof remained unpaid, and there-

after the plaintiff demanded payment of defendant Godfrey, which payment Godfrey refused to make; this being the first notice to Godfrey that plaintiff claimed him to be in any manner liable for his services. Plaintiff refused to deliver up the field notes and plat of his survey without payment or promise of payment, and Godfrey then and there warned Peck that, if Peck should send in such notes and plat, he (Godfrey) would not be responsible for the same, and that Peck had better hold such field notes. Peck then, upon the same day, went to Russell, the attorney who had employed Peck for the defendant company and who was acting as attorney in the patenting of such land; and Russell explained to Peck the deal between McHugh and the defendant company, told him that until patent was completed McHugh could not get any money from the parties interested in the company, with which to go ahead, and that unless these survey notes and plats were sent in, the deal between Godfrey and McHugh and the company would not go through. Russell was the agent of one of the original owners of these claims, and he assuerd plaintiff that, so far as the share originally owned by such party was concerned, he (Russell) would see that plaintiff got his money and that he would use his influence to get Godfrey to pay his share. Russell then showed Peck the agreements which had been entered into between Godfrey and the former owners and assured plaintiff there would be no trouble about the pay, that they had agreed, among themselves, to meet this if McHugh failed. Upon receiving such information, plaintiff transmitted his notes to the Surveyor General. Application for patent was subsequently prepared and signed by Godfrey, and patent was subsequently delivered by the land officers to Mr. Russell.

The court further found that Russell was at all times the agent and attorney of defendant Godfrey, and, further, that defendant company, in all that it did toward the improving of said premises and securing patent thereon, was the agent of said Godfrey. To such findings the appellant excepted and strenuously urges that there was nothing in the record to sustain the same.

It is the contention of Peck that Godfrey was personally liable: First, owing to the fact that he (Peck) was employed by the agents of Godfrey; second, because of the contracts entered into between Godfrey and the other former owners of the claims; third, upon an implied contract because of his having made use, for his personal benefit, of such field notes.

[1] Before considering these several contentions, we must first dispose of a question of practice raised by respondent. It appears that, upon the trial and after all the evidence was in, by leave of court granted, the plaintiff amended his complaint by adding thereto a so-called second cause of action, setting up a claim founded upon an implied contract; the defendant did not answer the same. Respondent now contends that such allegations as were contained in such amended complaint and had not been denied in the original answer must be taken as admitted. With this we cannot agree. This amendment was made after evidence was received, which evidence had been met by defendant. This being true, the allegations of such amended answer will be treated as denied. Any other rule would be inequitable. Respondent concedes in his brief that the cause was tried substantially as if on a general denial.

[2] In so far as the court found an agency to exist between Godfrey and the defendant company, such as would in any way redound to the benefit of the plaintiff, we think the court was in error. It is true that, under the federal law, the patent had to be procured by and in the name of the defendant Godfrey, he being the record owner of the claims, and that whatsoever was done by other parties that might assist, or be necessary for the procurement of such patent, was necessarily reported and shown, in the final proof, as being done by and on behalf of said Godfrey; but it appears that, under the agreements existing, everything connected with procuring a patent was to be done by and at the expense of defendant company, and that plaintiff was employed by that company to make the survey for them, knowing that their interest was not that of owner but merely equitable. What was the situation and relation of the parties interested

herein? Godfrey had agreed with the other former owners of this property to proceed at once to procure patents, and for that purpose they had placed in him the legal title to this property; he had entered into an option contract for sale of the premises as soon as final proof was made, which sale was in contemplation of the former owners as shown by their contract with Godfrey; in consideration of the option given him, McHugh had undertaken to assume the expense of and to do those things necessary for procurement of patent, all of which had to be done in the name of Godfrey; McHugh had assigned his interests to the defendant company which undertook to perform his covenants, he being manager of the company; the company employed Russell to act for them in procuring the patent; Russell, for them, employed Peck to do the surveying, Peck fully understanding he was being employed for such company and knowing that such company had only an equity in said claims. Peck makes no pretense that he understood that either Russell or the company was the agent of Godfrey when he did the work, or that he in any manner relied upon or extended credit to Godfrey in doing this work. Plaintiff lays great streess upon the fact that Godfrey made the proof before the land officers, and signed and swore to the necessary papers, which papers showed plaintiff as the employe of Godfrey and paid by him. The question before us is not whether the acts of the defendant company and of Russell would be the acts of Godfrey so far as the federal government was concerned, and Godfrey therefore bound by such acts in any contest between Godfrey and the government; but such question is as to whether the acts of the company and Russell were the acts of Godfrey so far as plaintiff is concerned. If Peck had done this surveying supposing that he was engaged to do it for Godfrey and relying upon the relation which Godfrey bore to this matter so far as the government was concerned, an entirely different question would confront us. Godfrey bargained with McHugh to do a certain thing as the consideration for the option given him. This work was of a kind which would in part have to be done by parties other than McHugh. The defendant company as the

successor to McHugh undertook to fulfill this agreement with Godfrey, which agreement was that these things should be performed at expense of McHugh. Under what possible interpretation of the contract between McHugh and Godfrey could it be held that McHugh had any authority as agent to bind Godfrey? Certainly none. Neither did he attempt to bind him, nor does Peck so claim. The defendant company therefore had no authority, and the attorney employed by it, Russell, could have no greater authority.

[3] But respondent urges that, even if such company and Russell had no authority to bind Godfrey for the payment of Peck's claim, yet that Godfrey had ratified their acts in employing Peck by using the notes and plat and thus became bound. But, as before stated, Peck never understood he was being employed by the company or Russell as agents for Godfrey, and therefore there was no chance for the application of the doctrine of ratification. This case comes directly under the rule laid down in decision upon rehearing in Minder & Jorgenson Land Co. v Bru.' tuen (lately decided by this court) 26 S. D. 38, 127 N. W. 546, wherein are cited page 127, Mechem on Agency, and Ferris v. Snow, 130 Mich. 254, 90 N. W. 850.

[4] Did Peck acquire any rights from the contracts between Godfrey and the other former owners of the mining claims? If not, such contracts were immaterial and improperly received in evidence. These contracts were entered into long before Peck performed his services, and, if he has acquired any rights thereunder, they were acquired as soon as the work was performed, and his right to sue did not depend upon the use of the survey notes by Godfrey, but he would have a right to sue whenever he tendered such notes to Godfrey. No question of agency can enter into this feature of the case, because, while these contracts were shown to Peck by Russell, and Russell advised him that he believed he would be paid if the patent issued, still, even if Russell were considered as the agent of Godfrey, there is no pretense that Russell in any manner attempted to mislead Peck as to the legal effect of the contracts. What was the legal effect of such contracts?

Respondent insists that this case comes squarely under the provisions of section 1193 of the Rev. Civil Code, which provides: "A contract made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Were the contracts in question made for the benefit of those who should do work or furnish material necessary for the proving up of these claims? If so, we think it would be conceded that it was not necessary for them to be named therein. For whose benefit was that part of these contracts inserted, wherein it was agreed that the former owners should bear the expense of patenting pro rata? Certainly for Godfrey's and none other. He had agreed to do this patenting. All parties expected this work and expense attached to be taken off his shoulders by McHugh. But, if McHugh failed, it was still the duty of Godfrey to go on, and if in so doing he expended money or contracted obligations, and the money for same was not forthcoming from McHugh, it was clearly the expectation and intention of the parties that, after patent, the claims should be reconveyed to their former owners, and such owners should share in the expenses paid or incurred by Godfrey. Respondent has cited cases holding that the purchaser of real or personal property who assumes a debt owing by his grantor can be sued by the creditor of such grantor. It must be readily seen that the principle in such cases has no application to the facts of this case. If A. owes B. $1,000, and sells C. property, and as part consideration therefor C. promises to pay the debt to B. there would be nothing changing A.'s liability to B., which would depend solely upon facts outside of such contract, and C. would become liable solely because of the said liability of A. to B. If, in above case, upon such sale, it was agreed that each should pay one-half of such debt, still the liability of A. to B. would not rest upon such contract, but upon the facts existing outside of same and it could not be held that A.'s covenant was for the benefit of B.

So in case at bar Godfrey's liability, if any, must exist independent of these contracts; there being no pretense that the other parties to such contracts were, independently of such contracts,

liable to pay those furnishing labor and material. The classes of cases where a third person can recover upon a contract claimed to be made for his benefit are fully set forth in 9 Cyc. 382. There must be some duty or obligation to pay on the part of the promisee, in order for promisor to be bound, or, in other words, Godfrey could not be liable to Peck under these contracts unless Godfrey's promisee, the other parties to the contracts, were in some manner liable, outside of the contract. See Jefferson v. Asch, 53 Minn. 446, 55 N. W. 604, 25 L. R. A. 257, 39 Am. St. Rep. 618, and notes to this case in 25 L. R. A. In the Minnesota case, after a very full discussion in relation to the classes of cases where the third party can and the classes where he cannot recover upon the contract, the court sums up with the following statement which we indorse, and which when applied to the case at bar prevents recovery by Peck against Godfrey on these contracts: "Without undertaking to lay down a general rule defining when a stranger to a promise between others may sue to enforce it, we are prepared to say that—where there is nothing but the promise, no consideration from such stranger, and no duty or obligation to him on the part of the promisee—he cannot sue upon it." Respondent has cited numerous cases in which it is claimed the facts were analogous to those in the case at bar, and wherein the party who, it is claimed, stands in Peck's position, would be entitled to a lien against the property of those standing in Godfrey's position. It is not necessary for us to review such decisions. No question of lien is before us, respondent not having appealed; but it must be conceded that parties often have a right to a lien against a party's property when they have no personal claim against him.

[5] Can respondent recover upon an implied contract? We think not. Respondent contends that section 1218, Rev. Civil Code, applies to the facts herein. Such section reads: "A voluntary acceptance of the benfit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known or ought to have been known to the person accepting." Under this section respondent contends that, when Godfrey filed the application for patent attaching thereto Peck's survey notes, and

by so doing accepted the benefit of Peck's work, he immediately became liable to pay Peck regardless of what he had the same day told Peck. There would be some force in this position providing that Russell had undertaken to promise that Godfrey would pay and Godfrey knew or ought to have known of such unauthorized promise; but, as we have already seen, Russell had no authority to bind Godfrey and furthermore did not attempt to. On the other hand, he advised Peck in relation to all the facts surrounding this matter and pointed out wherein his chances for pay would be better if he did file his notes—guaranteed him the payment of a part of his claim if he did file them (which payment was afterwards made)—and disclosed to him the contracts between Godfrey and the other former owners and assured him he believed he would get his pay. What about Godfrey? He had, upon the same day he filed the application, repeatedly told Peck that he would not pay him and advised him to hold on to his notes. Suppose after this, when he found that Peck had filed the notes, he had learned all that took place between Russell and Peck, in what position would he have been placed? He had bound himself to patent this land; everything was ready for the final proof; the notes had been filed voluntarily by Peck, who could not be relying upon any promise from him, but must be relying upon the guaranty of Russell to pay a part of the claim and the hope that after patent was issued the defendant company would fulfill its promises and pay this money or the former owners would finally do so. If Godfrey had not filed the application and proven up on the claims, he certainly would have been liable in damages to his former co-owners for failure to do so. Under such circumstances, there certainly was nothing upon which to base an implied contract to pay Peck. Furthermore, it will be noticed that there was nothing to advise Godfrey that the defendant company or McHugh had not finally paid Peck, and he certainly had a right to so presume, after Peck had told him that he was holding the notes for his pay and he (Godfrey) had advised Peck to hold them until he received his pay. In addition to all the above, Godfrey swore (and there was no attempt to disprove it): "I was told that

Mr. Peck was paid and swore to the affidavit to that effect."
There was no implied contract. Mann v. Farnum, 17 Colo. 427,
30 Pac. 332; Glenn v. Savage, 14 Or. 567, 13 Pac. 442; Barth-
olomew v. Jackson, 20 Johns. (N. Y.) 28, 11 Am. Dec 237; 15
Ency. Law, 1080. Respondent has cited several authorities that
would be in point providing that Peck, in performing the ser-
vices, had understood he was doing the work for Godfrey and
was at that time expecting to be paid by Godfrey; but as a matter
of fact he did the work for defendant company and expected to
be paid by it, and when he filed his notes his act was a gratuity
so far as Godfrey was concerned. In closing we may well say,
as was said in Bartholomew v. Jackson, supra: "I should be
very glad to affirm this judment; for, although the plaintiff was
not legally entitled to sue for damages, yet to bring a certiorari on
such a judgment was most unworthy. The plaintiff performed the
services without the privity or request of the defendant, and there
was, in fact, no promise, express or implied."

The judgment and order denying a new trial are reversed.

CORSON and McCOY, JJ., dissenting.