## FISH & HUNTER CO. et al. v. NEW ENGLAND HOME-STAKE MINING CO. et al.

Under Rev. St. U. S. § 2234 (U. S. Comp. St. 1901, p. 1435), authorizing the Surveyor General to appoint surveyors to survey mining claims, and providing that the expenses of surveys shall be paid by the applicants, and authorizing the Commissioner of the General Land Office to establish maximum charges for surveys, and the rules of the Interior Department, the employment, manner, and amount of payment for the survey of mining claims, are subjects of private contract between an applicant and a deputy surveyor, and the surveyor's fees may be paid in any commodity agreed on; but, where an applicant and a deputy surveyor have made an arrangement as to payment, the surveyor must make the survey and return correct field notes without delay, notwithstanding any dispute over the payment of fees.

McCoy, P. J., and Corson, J., dissenting.

(Opinion field, February 14, 1912.)

On petition for rehearing. Denied.

For former opinion, see 27 S. D. 221, 130 N. W. 841.

SMITH, J. This case is before us on rehearing. It will be found reported in 27 S. D. 221, 130 N. W. 841. A careful reexamination of the case satisfies us that our former decision is correct. One matter referred to in the petition for rehearing, however, was not fully reviewed in the opinion of the court. A consideration of this question does not render necessary a restatement of the facts, which are fully set forth in the former opinion.

The statutes of the United States authorize the Interior Department to make rules and regulations for obtaining title to mineral lands. Under these rules and regulations, it is required that an application be made to the United States Surveyor General for survey of mining claims for an official survey of the property, together with an estimate of the amount required to defray the expenses of platting and other work required in the Surveyor General's office, that the applicant may make a proper deposit thereof in the office, and that "thereupon you will cause the survey to be made by [naming the surveyor], United States deputy mineral surveyor." Upon the completion of the survey, the applicant is required to present to the register and receiver of the United

States Land Office a sworn statement or application, to the effect that he has become the owner of the land "described in the field notes of the survey hereof, hereto attached.  *  *  *"  In connection with this application must be filed an affidavit that in the prosecution thereof the applicant "has paid out the following amounts, viz.: To the credit of the Surveyor General's office $——; for surveying $——," etc.   United States Statutes, § 2334 (U. S. Comp. St. 1901, p. 1435), is as follows: "The Surveyor General may appoint in each land district containing mineral lands, as many competent surveyors as shall apply for appointment, to survey mining claims.   The expenses of the survey of the vein, lode or claim  *  *  *  shall be paid by the applicants, and they shall be at liberty to obtain the same at the most reasonable rates, and they shall also be at liberty to employ any United States deputy surveyor to make the survey.   The Commissioner of the General Land Office shall also have power to establish the maximum charges for surveying  *  *  *  and to the end that the commissioner may be fully informed on the subject, each applicant shall file with the register, a sworn statement of all charges and fees paid by such applicant for publication and survey  *  *  * which statement shall be transmitted with the other papers in the case, to the Commissioner of the General Land Office."   The substance of this section, and its purpose and intent, are condensed into and expressed in section 90 of the United States Mining Laws and Regulations, approved December 18, 1903.   "The Surveyors General of the several districts will in pursuance of said law appoint in each land district, as many competent surveyors for the survey of mining claims as may seek such appointment, it being distinctly understood that all expenses of these notices and survey are to be borne by the mining claimant and not by the United States."   Section 126 of these regulations is as follows: "No return by a mineral surveyor will be recognized as official unless it is over his signature as a United States deputy mineral surveyor, and made in pursuance of a special order from the Surveyor General's office. *After he has received an order for the survey he is required to make the survey and return correct field notes thereof, to the Surveyor General's office without delay.*"

Section 127, Regulations, etc., provides: "The claimant is required in all cases to make satisfactory arrangements with the surveyor for the payment for his services and those of his assistants, in making the survey, as the United States will not be held responsible for the same." Respondent now contends that Godfrey, as owner of the claims, having made application for the appointment of Peck as surveyor, and the Surveyor General having appointed him to survey the claims, an obligation was created by the laws of the United States, and an implied promise was raised that Godfrey would pay Peck for the survey. Section 127 of the rules and regulations above quoted is an authoritative interpretation of section 2334, U. S. Statutes, and neither the statute nor the rule purports or intends to create any contractual relation, either express or implied, between the claimant and the deputy mineral surveyor. One thing is made entirely clear; and that is that the United States government cannot be required or obligated to pay for the survey, even though made by one of its own officers, namely, a United States deputy mineral surveyor. There is nothing in the statutes or the rules, so far as we know, which requires any deputy surveyor to make a survey or enter into a contract with an applicant for a survey, except upon terms and conditions which are satisfactory to himself and the claimants. The department is authorized to fix the maximum fees for the survey, but nothing in the statute or the rules and regulations requires any deputy surveyor to accept even the maximum fees and to make a survey as a public or official duty upon the request of an applicant therefor. The matter of employment, and the manner and amount of payment of the surveyor, are left wholly to the choice and free will of the applicant and the deputy. Any deputy surveyor within the district may be selected by the applicant, and any arrangement or agreement whatever, which is satisfactory to them, may be made as to payment for such services. In the language of section 127, "the claimant is required in all cases to make satisfactory arrangements with the surveyor for the payment for his services." Nothing further is required. The amount, the time, and manner and mode of payment may be such as is satisfactory to them. The deputy may accept anything of value satis-

factory to him in payment. The United States government has absolutely nothing to do with these arrangements or agreements, except it may protect the applicant from extortionate demands by fixing a maximum fee. The payment is as much a matter of private contract and agreement as are other business contracts or relations between man and man. No reason is perceived why the surveyor may not agree to extend the time of payment for his services one year or ten years. Necessarily the survey is made for the benefit of the applicant. But no time or mode of payment therefor is required, other than such as shall be satisfactory to the parties themselves. Precisely this and nothing more is meant or intended by the rule requiring the applicant to make affidavit that he has deposited the necessary amount in the office of the Surveyor General, and has paid the necessary amount for the survey. The surveyor's fees may have been paid in horses or cattle, or promissory notes of a third person, or in bonds or stock, or in any other thing or commodity satisfactory to him. One thing, however, the rules and regulations of the department require; and that is that, when the applicant and the deputy surveyor have made arrangements satisfactory to them as to payment and a special order from the Surveyor General's office has been made appointing the deputy, he is required to make the survey and return correct field notes thereof without delay. Rules and Regulations, § 126. Under this section, it is absolutely clear that, after having made a survey, it is the official duty of the deputy to return the field notes to the Surveyor General's office without delay, and he has no right whatever to refuse to return them because of any dispute or misunderstanding with the claimant, or any other person, over the payment of his fees. When he has accepted the appointment and performed the work, the department has nothing to do with the question of payment or nonpayment of his fees, and the rule imperatively requires, whether paid or unpaid, he shall make the proper return to the Surveyor General's office. It is plain, therefore, that neither the statute nor the rules and regulations purport to create any contract relation, whatever, either express or implied, between the applicant and the deputy surveyor. Under this rule, it is conclusively presumed after the

deputy has accepted the appointment, and has made the survey, that arrangements for his payment satisfactory to him have already been made.

The rule contemplates that the business of the department shall not be hindered or delayed by his withholding the report and field notes pending settlement of differences which may have arisen. Neither are the relations of the claimant and the surveyor in the slightest degree changed or affected by the fact that the surveyor may have filed his field notes and claimant may have received the benefit of the survey. It is clear that the same agreement which was originally made as to payment remains in force after the notes are filed and the claimant has received the benefit thereof, and no new or implied contract arises because the claimant has received such benefit. It is undisputed that Godfrey entered into a contract with McHugh for the sale of the mining claims to him, and that the consideration for the contract was the promise and agreement of McHugh to furnish all money and perform all services necessary to secure patents to the claims. Under this contract, McHugh did not bind himself to take the property. It was left optional with him, but the contract conclusively bound him to furnish the money and perform the services necessary to patent the claims. This benefit the claim owners were entitled to receive under the contract, without cost to them, even though McHugh declined to accept the property or complete the sale. The obligation of McHugh to pay these expenses was absolutely under the contract, and the fact that this proceeding must be taken in Godfrey's name in no manner changed his obligation. It was the duty and right of McHugh, under the contract with Godfrey, to employ and pay any surveyor he might select as well as to pay all other expenses incidental to the proceeding. It stands undisputed that the New England Homestake Mining Company became the assignee of and accepted all the duties and obligations assumed by McHugh under this contract. It is undisputed that Russell as the agent had full authority to represent the mining company. It is undisputed that Russell did employ Peck and contracted with him as to terms of payment, which were satisfactory to him, to make this survey. It is undisputed that the

New England Homestake Mining Company, through Russell, its representative, paid to Peck $200 of the contract price for the survey. It is conceded and Peck himself testified that, when he made the agreement with Russell to do this work, he knew and understood that it was for the New England Homestake Mining Company, and he was to receive his pay from them. It is perfectly clear that nothing transpired thereafter which in any manner changed or modified this original agreement under which the survey was made. The filing of the field notes and the issuance of the patent in no way changed the agreement. Godfrey has received nothing which he was not entitled to receive under the contract with McHugh and the mining company. Hence there was not, and could not be, any new consideration for an implied contract on his part to pay Peck for the survey.

We are satisfied our decision was correct upon all questions presented on the appeal, and the judgment and order of the trial court are reversed, and a new trial granted.

McCOY, P. J. (dissenting). I am unable to concur with the majority opinion for the following reasons: It appears from the record that the defendant Godfrey, together with a number of other parties, were the owners of a number of not proved up on mining claims; that, in order to make final proof on these mining claims, all the several owners thereof conveyed their interest by contract to Godfrey, who was to make final proof and secure patent in his name. It was a necessary part of the making of final proof and procuring the patent to said mining claims to have the same surveyed. Patent could not be secured without the survey. Now, it also appears that at about the time these mining claims were so conveyed to Godfrey the owners thereof had a purchaser for the same in view in one McHugh, who was acting for the New England Homestake Company, and that Godfrey on behalf of all said owners entered into a contract with McHugh, whereby Godfrey agreed to sell, and McHugh agreed to purchase, said mining claims, and also pay the expenses of surveying and procuring the patents. The contracts between Godfrey and these other owners of the claims contained the provision that Godfrey

was to be bound for the cost of patenting said claims only in the event of the said claims being purchased and the patent expenses paid by McHugh, and that, in the event McHugh should fail to purchase, the patent expenses will have to be borne proportionately by those interested in the property. The plaintiff Peck did the surveying necessary to procure said patents. He testified that one John R. Russell, attorney for the New England Homestake Company, did the talking with him in regard to his employment; that he made the first statement out charged to Godfrey, and presented it to Russell, who asked him to change it, and to make it out to the New England Homestake Company. "I understood the title was all in Godfrey, that the other parties had all conveyed to him for the purpose of getting patent. The application for patent was made in the name of Godfrey." It also appears that after this surveying was all completed plaintiff was unable to obtain all his pay therefor; that the New England Homestake Company paid him a portion thereof, but he was unable to obtain the balance. In this connection plaintiff testified: "After the official survey had been completed and was in my hands, the New England Homestake Company was involved in money difficulties, and had no money to pay for the surveys, and I was holding them until some arrangement could be made whereby I could get my pay. I saw McHugh, Russell, and Godfrey, and stated to them what I was doing. They were very anxious to have the survey sent in, and I asked Godfrey if he would guarantee the survey if I sent it in, and he refused to stand for any portion of it. I was not satisfied, and went to Mr. Russell, and told him I intended holding that survey until I was sure of my pay, and Russell said there would be no trouble about the pay, that they had agreed among themselves to meet this thing if McHugh failed, and under these conditions I sent in the survey. I sent it in under the agreement that was read here (the contract between Godfrey and his co-claim owners), that the owners would pay if McHugh did not, and the survey was approved and used." Now, it also appears from the record that Russell was also the attorney for Godfrey in procuring the patents for these mining claims. Russell, testifying for defendant, said: "I told him that I would use my influence to get

Godfrey to pay his share, but only bound the Carroll heirs, and I went and got the two agreements with Godfrey and Ruth to show him they had to pay their share—that Godfrey could make them pay their share. I showed the agreements to Peck, and I presume he read them. I showed him the agreements among the different owners, that, if McHugh did not pay, they would. I prepared the application for patent, and Godfrey signed the patent papers. I have the patent in my office. I was doing the work for the New England Homestake Company. I have the patent in the name of Mr. Godfrey for him." Godfrey testified: "I know Peck did turn the papers over after I had this talk with him, and they were filed in the land office. I swore to the application for the patent. I was told Peck was paid, and swore to the affidavit to that effect. Russell must have used the notes in the application for the patent after these talks I had with Peck. I did not tell him to. I conveyed these interests back to the parties that really owned them after this suit was commenced."

There are no theories, however finely spun and enchanting the same may be, that will lead me from the conclusion, morally and legally, that defendant is liable and should pay Peck the balance due for said surveying. To go back to the contract between Godfrey and his co-claim owners, whereby "it was further agreed that Godfrey is to be bound for costs of patenting only in the event the property is purchased by McHugh, and that, in the event McHugh shall fail to purchase, the patent expenses will have to be borne proportionately by those interested in the property." The only possible reasonable construction of this clause is that, in case McHugh failed to purchase, the claim owners would contribute to Godfrey the proportionate share of the expense of procuring patent. This was a provision of the contract solely for the protection of Mr. Godfrey in case he had to pay the expense of procuring the patents. This is the construction placed on this contract by Mr. Russell, mutual attorney for the parties. There is no question but what McHugh failed to purchase because Godfrey reconveyed to the original owners after this suit was. instituted. The contract between Godfrey and his co-owners was that he

should procure patent, which he did. The authority thus conferred on him necessarily implied the doing of everything necessary to obtain said patent. It implied the employment of a surveyor and an attorney. It implied that he should pay for these services. When he employed an attorney, the attorney was vested with authority to do all things necessary to procure said patent. The testimony shows that the attorney obtained the survey notes necessary to make the application for patent on the strength of the provision in the contract between Godfrey and his co-owners. While there is testimony showing that the attorney was working for the New England Homestake Company, still the facts and circumstances conclusively show that he was also working for Godfrey—that he was the mutual attorney of the parties interested in procuring this patent. When McHugh failed to purchase, the several claim owners became bound to Godfrey to pay whatever amounts he had obligated himself to pay for the procuring of the patents. When Godfrey annexed the surveyor's notes, made by plaintiff, to his application for patent, and made affidavit that plaintiff had been paid therefor he thereby accepted the benefits of plaintiff's labor, he thereby obligated himself to pay plaintiff. When Mr. Russell, attorney, who was procuring this patent, obtained the surveyor's notes from plaintiff on the strength of the clause in the contract between Godfrey and his co-owners, an obligation was also created on the part of Mr. Godfrey through his at least ostensible agent, binding Godfrey for the payment of said surveying, notwithstanding the fact that Godfrey had said prior thereto he would not pay for the same. Godfrey had authorized, by his acts at least, Russell to procure the patent, and was bound by whatever Russell did within the necessary scope of procuring said patent. When Godfrey appropriated and accepted the benefits of this survey, knowing that plaintiff was expecting pay therefor, he thereby became impliedly liable to pay for such surveying. It is an elementary principle that when one accepts and appropriates the benefits of another's labor for his own beneficial use, under circumstances showing that the labor was not performed as a gratuity, but with the expectation of compensation, the one who thus receives such benefit must respond in compensa-

tion.  At all times the defendant was just as much interested in the matter of having this surveying done as was McHugh, although McHugh had agreed to pay for the same, and, when McHugh failed to purchase, the entire benefit inured to the defendant under his contract with his co-owners.   Neither do I believe plaintiff was required to part with his survey notes before payment therefor.   That a party desiring to patent a mining claim might go to a surveyor and employ him to do the necessary surveying under promise that, as soon as his survey was completed, he should receive his pay, but, on completion of the survey, the applicant for patent could stand him off without paying, and still compel him to file his survey notes so that the patent might issue, on the ground that it would hinder and delay the department, is unreasonable on its face.   The rule that the applicant must make affidavit to the fact that he has paid the surveyor when he applies for patent is for the benefit of the surveyor and for the purpose of compelling his payment before patent issues.   While it is true that the department has nothing to do with the payment of the surveyor or the fixing of his fees, still it requires the fees to be paid in advance as a condition preceding application for patent, which fact must appear by affidavit.   Whether the surveyor holds up his notes for pay or not does not, or will not, hinder and delay the department in the least.   It only hinders and delays the applicant for the patent, who is entitled to be so hindered until he pays his surveyor, and a patent issued on a false affidavit, as was done in this case, would no doubt be ground for canceling the same.   Of course, the surveyor can take his pay in anything that satisfies him, but he must be paid in some manner, or else the applicant is not entitled to the survey notes.   If the surveyor must under the law send in his notes, pay or no pay, then the one receiving the benefit would be bound to him as a public officer, whether there was any mutuality of contract or not.   Under such circumstances, the law implies a promise to pay whether any request was ever made or not.   9 Cyc. 243.

There is another very significant matter shown by the record in this case, and that is that all the co-owners of Godfrey have

settled and paid their proportionate share of the surveyor's bill except one Flow, who owes $24.50. Godfrey and wife owe all the balance of $250.86. This amount he owes, not as a trustee for the other claim owners, but in his own individual capacity as an owner of the land surveyed for his proportionate share under the contract with his co-owners. The findings and judgment in this case are for $275.58, a few cents in excess of the Flow and Godfrey shares as individual owners. There has been no application by defendant to reduce the findings and judgment to the amount of his individual share. This amount he should pay under any circumstances of this case. Russell had implied authority from Godfrey, by reason of the fact that he was procuring the patent for Godfrey, to secure the surveyor's notes for the purpose of procuring the patent. Godfrey was the only one authorized by the owners of these mining claims to procure the patent. The New England Homestake Company was not authorized to and could not procure the said patent. Godfrey was the only one authorized to procure the patent, and hence Russell could only have been working for Godfrey when he procured the surveyor's notes for the purpose of obtaining the patent, and Godfrey as the representative of the owners of the claims was liable to pay for this surveying work by reason of the acts of Russell. Godfrey is protected by the terms of his contract as against all the co-owners, except as to his own share. The judgment is substantially only for Godfrey's own individual share which he should pay, under the circumstances of this case, whether he ever promised to do so or not. He knowingly accepted the benefits of plaintiff's work, and even went so far as to swear that plaintiff had been paid, when the circumstances render it pretty certain that he knew that defendant had not been paid. The law implies a promise under such circumstances.

The findings and judgment of the circuit court are right and should not be molested by this court.

CORSON, J. I concur in the foregoing dissenting opinion of Judge McCOY.